IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **GREAT AMERICAN INSURANCE COMPANY** <br> 580 Walnut Street <br> Cincinnati, Ohio 45201 | : <br> : <br> : | CASE NO. <br><br> (Judge            ) |
| Plaintiff, | : : : | |
| v. | : : | |
| **GEMMA POWER SYSTEMS, LLC** <br> 769 Hebron Ave. <br> Glastonbury, Connecticut 06033 | : : : : | **COMPLAINT FOR** <br> **DECLARATORY JUDGMENT** |
| Serve: Corporate Creations Network, Inc. <br> 119 E. Court Street <br> Cincinnati, Ohio 45202 | : : : : : | |
| Defendant. | : | |

Great American Insurance Company ("Great American"), by and through its undersigned counsel, hereby states for its Complaint for Declaratory Judgment against Defendant Gemma Power Systems, LLC ("Gemma") as follows:

**PARTIES**

1. Great American is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Great American is duly qualified and authorized to transact business in the state of Ohio and is authorized to issue surety bonds and other obligations of suretyship.

2. Upon information and belief, Gemma is a company organized under the laws of the state of Connecticut and is registered as a foreign limited liability company in the state of Ohio.

## JURISDICTION AND VENUE

3. This Court has the power and jurisdiction to determine the parties' respective rights and other legal obligations as requested herein pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. Gemma's demand on Great American, discussed below, creates an actual controversy for this Court to adjudicate.

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(a), because the relevant actions and transactions occurred within this judicial district.

## FACTS COMMON TO ALL CLAIMS

### The Pertinent Contract Documents

6. This matter arises out of the construction of a natural gas electric generating facility located in Butler County, Ohio and commonly known as the NTE Middletown Energy Center (the "Project"). Gemma served as the general contractor for the Project and also self-performed significant portions of the pipe installation work on the Project.

7. On or about July 11, 2017, Great American issued Subcontract Performance Bond No. CA1989839 (the "Bond") for its principal, Kramig, Inc. ("Kramig"), in relation to the Project. A true and accurate copy of the Bond is attached hereto as Exhibit A, and is incorporated herein by reference. Under the terms of the Bond, Kramig is identified as "Contractor," Gemma is identified as both "Owner" and "Obligee," and Great American is identified as "Surety." The

penal sum of the Bond is $3,289,000 (the Penal Sum"). The Penal Sum represents that maximum exposure Great American can have under the terms of the Bond under any circumstances.

8. The Bond was issued pursuant to a subcontract between Gemma and Kramig for the Project dated July 7, 2017 (the "Kramig Subcontract"). A copy of the Kramig Subcontract is attached hereto as Exhibit B and incorporated herein by reference. Pursuant to the Kramig Subcontract, Kramig was engaged to perform certain, discrete tasks at the Project, specifically pipe insulation work for the total contract price, subject to change orders, of $3,289,000.

9. The Bond that had been prepared by Gemma and not Great American states in relevant part:

> 1. The Contractor and the Surety, jointly and severally, bind themselves and, their heirs, executors, administrators, successors, and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.
>
> …
>
> 3. If there is no Owner Default, the Surety's obligation under this bond shall arise after
>
>> 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner has declared a Contractor Default.
>>
>> 3.2 The Owner has agreed to pay the Balance of the Contract Price To the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the Contract with the Owner.
>
> 4. When the Owner has satisfied the conditions of Paragraph 3, within fifteen (15) days of Owner's declaration of a Contractor default, the Surety shall promptly and at the Surety's expense take on of the Following actions:
>
>> 4.1 Arrange for the Contractor, with consent of the Owner, to per-form and complete the Construction Contract; or

    4.2   Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

    4.3   Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

    4.4   Waive its right to perform and complete, arrange for completion or obtain a new contractor and with reasonable promptness under the circumstances:

        .1   After investigation, determine the amount for which it may be liable to the Owner and, within thirty (30) days after the amount is determined, tender payment therefore to the Owner; or

        .2   Deny liability in whole or in part and notify the Owner citing reasons therefore.

…

6.   After the Owner's declaration of a Contractor Default, if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

    6.1   The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

    6.2   Additional legal, design professional, delay, actual damages and all consequential costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

  6.3 The liquidated damages specified in the Construction Contract that are assessed due to the delayed performance or nonperformance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, Administrators or successors.

…

12. DEFINITIONS

  12.1 Balance of the Contract Price. The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

10. Exhibit A to the Kramig Subcontract, entitled "Scope of Work," provides in pertinent part as follows:

  2. Details:

   …

  e. Subcontractor will work through formal "Line Release" or "Equipment Release" forms and shall only insulate those specific items that have been released by [Gemma] in writing. If the Subcontractor has a form they'd like to use, please submit [ ] for review. Any costs or rework required due to insulating items that are not specifically released shall be at the sole cost of the Subcontractor.

11. The contract for the work by Kramig was prepared by Gemma and included a specific schedule as to when portions of the insulation work were to be available for

5

performance. Based on industry norms, such a schedule would be used to determine the staffing and manpower utilization and to determine the costs for performance.

12. In framing its bid, Kramig would have had the right to rely, and based on information and belief did rely, on the accuracy of the schedule set forth in the contract to determine its bid and plan for the performance of its work.

13. Gemma knew or should have known that deviations from the specified schedule would have impacted the costs to perform the work, would have impacted the efficiency of the performance of the work, and would have increased the costs for performance justifying increases in the contract price through change orders and equitable adjustments.

The Project

14. Pursuant to the terms of the Kramig Subcontract and the schedule set forth in the bonded contract, Kramig was to mobilize during the week of July 10, 2017 in order to construct the scaffolding necessary to begin its pipe insulation work. Based on information and belief, Kramig submitted to Gemma a schedule for its performance of the insulation work that conformed to the schedule set forth in the bonded contract.

15. However, shortly after the Kramig Subcontract was executed, Gemma demanded changes to Kramig's manpower schedule in order to delay Kramig's "ramp-up" time because significant segments of the piping, that was to be installed by others, including Gemma, were either not yet installed or not yet ready to insulate.

16. Indeed, as of June 2017 the Project was already "trending late" because large segments of the pipe installation work, including portions thereof being self-performed by Gemma, were significantly behind schedule. In response and, on information and belief, without comment or input from Kramig, Gemma unilaterally changed the terms of the contract and

created a recovery plan and submitted it to the Project owner with the goal of bringing the Project back in line with the Project schedule. Shortly thereafter, Gemma initiated an additional pipe erection shift with the goal of recovering the significant pipe schedule slippage.

17. The installation of pipe by both Gemma and its piping subcontractors was a necessary prerequisite to Kramig's work performance. Plainly stated, Kramig could not insulate pipes that were not yet installed. Gemma knew or should have known that delays in the installation of the pipe would substantially impact the ability of Kramig to perform the insulation of the pipe according to the terms of its contract, would adversely impact the ability of Kramig to maintain the schedule set forth in the bonded contract, and would substantially increase the costs for such performance.

18. Although Kramig's work was to begin in earnest during mid-July, 2017, no piping work was released until August 24, 2017. Moreover, project records indicate that, month after month, Gemma failed to meet recovery schedule benchmarks and the Project's pipe installation continued to lag. The delays caused by Gemma and its subcontractors adversely impacted trades that were dependent on the timely installation of the pipe, such as pipe insulation.

19. By August of 2017, based on information and belief Kramig was growing concerned about the Project schedule, and its ability to perform work in several locations as contemplated by the Kramig Subcontract, given Gemma's failure to ensure that precedent pipe installation was proceeding with sufficient speed. Kramig was particularly concerned because it was not receiving the contractually required line releases to begin its work which were material elements of the contract and schedule.

20. Significant aspects of Kramig's work were also dependent upon the prior completion of heat trace testing. "Heat tracing" is the application of radiant heat to a piping

7

system through the use of tubing that is attached to the outside of the pipe. Heat trace testing confirms that the intended radiant heat is in fact being supplied to the piping system as intended. Heat trace testing cannot occur if the pipe to be tested has already been insulated; therefore, large segments of Kramig's work could not be commenced let alone completed until the heat trace testing had occurred. Gemma did not even select its heat trace contractor until September 17, 2017 – two full months behind schedule.

21. Gemma knew or should have known that delays in selecting a heat trace subcontractor would adversely impact the ability of Kramig to perform its work in a timely manner, would adversely impact the costs to perform the work, and would increase the costs for performance through lost efficiencies and acceleration of the work schedule

22. Through August and September 2017, Kramig and Gemma discussed the delays in the project schedule on multiple occasions and the impact of these delays on as Kramig's ability to complete its work on a timely basis as contemplated by the Kramig Subcontract. Gemma knew or should have known that Kramig's performance was being adversely impacted by Gemma's inability to adequately manage precedent trades. On or about September 18, 2017 Gemma affirmatively acknowledged that Kramig was behind schedule in the performance of its insulation work because of factors that were outside of Kramig's control.

23. As of early October 2017 Kramig was still awaiting approval from Gemma to order material for its scope of work. Later in October, as the schedule continued to slip for reasons beyond the control of Kramig, Gemma terminated its project manager from the Project.

24. Pursuant to the terms of the Kramig Subcontract and in accordance with the designated schedule for the release of work for performance as set forth in the Kramig Subcontract, Kramig was obligated to provide a single shift on the Project that would work five,

ten hour days per week, Monday through Friday. The delays caused by Gemma prevented Kramig from complying with the initial schedule, and Gemma knew or should have known that the project delays that were beyond the control of Kramig prevented Kramig from complying with the initial schedule.

25. In October 2017 Gemma requested that Kramig submit an increased manpower schedule. Kramig submitted a budget of $925,000 to increase its crew to 70 men, working on a 7:00 AM to 10:00 PM schedule for a period of 6 to 7 weeks. In response and without justification or proper analysis, Gemma offered to pay only $243,500 for premium time for hours to be worked by Kramig employees during the period of November 2, 2017 and December 14, 2017. Kramig in good faith proceeded to accelerate its work on the compressed schedule even without a formal written change order.

26. On or about November 25, 2018, Gemma formally demanded that Kramig accelerate its work under the compressed schedule. During November 2017 and into December 2017 Kramig and Gemma exchanged correspondence negotiating a change order that would add sums to the Kramig Subcontract to compensate Kramig for acceleration demanded by Gemma to meet the compressed schedule. Through this process Gemma acknowledged that Kramig's schedule would need to be extended to account for the fact that significant portion of precedent piping had not released for insulation until as late as August 24, 2017 and did not select a heat trace subcontractor until late September.

27. Throughout the course of negotiations on the above-referenced change order, Kramig repeatedly sought a change order and/or an equitable adjustment of at least $1,000,000 to the Kramig Subcontract to account for the acceleration and schedule compression mandated by Gemma and already undertaken by Kramig during the month of November, 2017.

28. During these periods, Kramig had prepared and submitted in a timely manner Applications for Payment for work performed under the Kramig Subcontract, but Gemma without justification had refused to pay the sums due Kramig. Kramig repeatedly sought payment of these significant sums that were due and owing under the Kramig Subcontract.

29. Gemma knew or should have known that the refusal to pay Kramig the sums that were due and owing to Kramig was a material breach of the bonded contract.

30. Gemma consistently declined to agree to a contract addition for the amounts sought by Kramig, but continued to demand that Kramig continue to accelerate its work with an increased staff.

31. Also during the time Gemma refused Kramig's calculations of compression costs, Gemma breached the Subcontract by failing to pay Kramig. Under the contract Gemma agreed to pay Kramig within thirty (30) days of Gemma's receipt of acceptable pay applications. At the time Kramig left the project it had receivables earned and unpaid totaling $1,088,029.26.

32. Unable to secure a satisfactory commitment from Gemma that it would be compensated for: (i) the contract work that it had already completed, (ii) the accelerated work that it had already performed, or (iii) anticipated future accelerated work, and because Gemma breached the contract by not paying timely, Kramig declined to continue its performance on the Subcontract and ceased all work on the Project on approximately December 9, 2017.

33. Upon information and belief, Kramig subsequently submitted a seven-figure payment bond claim against the separate surety bond provided by Gemma to the owner for the Project.

The Bond Claim and Investigation

34. On or about December 20, 2017, Gemma notified Great American by letter that Kramig had ceased working on the Project. Within 24 hours, Great American contacted Gemma to discuss the Project. Between December 20 and December 21, 2017, Great American had several discussions with both Gemma and its counsel concerning the Project and the completion of Kramig's scope of work. During this same timeframe Great American retained a consulting expert to assist in its understanding of the Project and the concerns expressed by Gemma regarding the completion of Kramig's work scope.

35. On or about December 22, 2017, Gemma formally terminated Kramig from the Project. As of this date, exclusive of any additive Change Order to account for changes in the schedule, delays caused by Gemma and other third parties over which Kramig had no control, acceleration, and schedule compression, the total Contract Balance as defined by the Bond remaining on the Kramig Subcontract was $2,752,166 (hereafter the "Contract Balance").

36. On December 26, the day after Christmas, Great American's consultant visited the Project with the intent of meeting with representatives of both Gemma as well as two possible replacement contractors identified by Gemma to complete the Kramig scope of work, Superior Insulation ("Superior") and Brand Construction ("Brand"). Gemma failed to coordinate the meeting with the replacement contractors as had been requested by Great American. Gemma also declined to provide Great American's consultant with relevant documents that he requested to more fully understand what work was actually left to be completed.

37. Beginning on December 27, 2018 Great American advised Gemma of those documents that would be needed to enable Great American to conduct a meaningful

investigation of Gemma's Bond claim. Over the course of the next two months, Great American reiterated its request for several important documents, including but not limited to the following:

- Copies of all formal releases of works areas provided to Kramig (requested 12/22/17);

- Copies of all project tracking reports or spreadsheets (requested 12/27/17);

- Copies of all approved and pending pay applications on the Project (requested 12/22/17);

- Full schedules (including native format), including all recovery schedules (requested on 12/27/17 and 2/14/18);

- Shop drawings and approved submittals (requested on 12/27/17);

- Copies of all approved and pending change orders (requested on 12/22/17 and 12/27/17);

- Superior's "not to exceed" price for the completion of Kramig's work scope (requested 2/14/18)

- All piping system test reports (requested 2/14/18);

- Daily logs from all piping subcontractors (requested 2/14/18); and

- All heat trace test results (requested 2/14/18).

38. Inexplicably and without justification, Gemma refused to provide these documents to Great American. Ultimately, after a lengthy in-person meeting between Great American and Gemma personnel, Gemma agreed to produce its monthly reports to the Project owner NTE for the period of March through December 2017 (the "NTE Monthly Reports"). The NTE Monthly reports only served to: (i) highlight the significant delays encountered by Gemma on the Project for which Kramig was not responsible, and (ii) reinforce the need for Gemma to give Great American the basic Project documentation that had been previously requested.

39. Almost immediately after Kramig ceased its work on the Project, Gemma authorized Superior and Brand to begin performing portions of Kramig's scope of work on a

12

time and material basis. In order to facilitate the timely and orderly completion of the Kramig Subcontract work, Great American consented to the performance of this time and material work while plans were made to formally secure a replacement contractor.

40. From the outset, Great American requested Gemma's cooperation in securing a replacement contractor subject to a fixed bid. Gemma determined that it desired to solicit bids from Superior and Brand for the completion of the Kramig scope of work. Both Superior and Brand had originally bid on the Kramig scope of work and both had also performed other pipe insulation work on the Project. Understandably, Great American sought to confer with both Superior and Brand before they submitted their respective bids to complete the Kramig work scope. Gemma denied Great American's request and elected to secure the bids on its own. As such, Great American was not permitted to confer with either Superior or Brand before their completion bids were submitted.

41. In mid-January 2018 both Superior and Brand supplied their bids to complete the Kramig scope of work. Great American sought to communicate directly with both Brand and Superior concerning their bids. Gemma denied this request. All the while, these two entities continued to work toward the completion of Kramig's scope of work on a time and material basis. Great American repeatedly requested that Gemma secure a "not to exceed" commitment from these entities with respect to the completion of the Kramig scope of work. Great American did so as it was evident that these contractors were accelerating the performance of the Kramig completion work at Gemma's request—dedicating additional manpower and working on additional shifts for this purpose.

42. To date, Gemma has failed to enter into a fixed price agreement with any replacement contractor to complete the remaining Kramig work scope.

43. To date, Gemma has ignored Great American's requests and has failed to secure a "not to exceed" commitment from either Superior or Brand with respect to the performance of the remaining Kramig work scope on a time and material basis.

44. Pursuant to paragraphs 3.2 and 12.1 of the Bond, Great American repeatedly requested that Gemma pay the Contract Balance to Great American, or commit the Contract Balance to pay for the completion work, in accordance with the terms of the Kramig Subcontract and consistent with the express language of the Bond. Gemma has declined to do so.

45. Great American has repeatedly requested that Gemma agree to an appropriate addition to the Kramig Subcontract price to account for the acceleration of the Kramig scope of work, the loss of efficiency, and the compression of the initial schedule—both for the period before Kramig ceased its work on the Project and the period after Kramig ceased its work on the Project. Gemma has refused to consider any addition to the basic contract price despite the fact that the acceleration, loss of efficiency, and compression was caused by its own deficient Project management.

46. On or about March 8, 2018, Gemma made a written demand that Great American pay Gemma $6,135,604.92 "on the Bond" to resolve its claim with respect to Kramig's alleged default of the Kramig Subcontract (the "Gemma Demand"). The Gemma Demand exceeds the Penal Sum by $2,846,604.92, and gives no credit for the Balance of the Contract as required by the bond, and includes no adjustments whatsoever for acceleration of the Kramig scope of work, the loss of efficiency and compression.

## COUNT I
### Declaratory Judgment: The Bond is Void *Ab Initio*

47. Great American incorporates by reference, as if fully restated herein, all allegations contained in paragraphs 1 through 46 of the Complaint.

48. Great American wrote the Bond to guaranty the performance of its principal, Kramig, under the terms of the Kramig Subcontract. In so doing, Great American relied upon the terms and conditions stated in the Kramig Subcontract to encompass its bonded obligations, rights and duties. This specifically included the schedule incorporated into the Kramig Subcontract by Gemma for the completion of Kramig's work on the Project.

49. Gemma's deficient Project management either created or permitted serious schedule delays that rendered it impossible for Kramig to complete its scope of work on the Project on the same schedule and with the same manpower originally contemplated by the Kramig Subcontract.

50. In response to the delays that it either caused or permitted, Gemma demanded that Kramig increase its manpower and accelerate its work on the Project, yet refused to issue a change order that would: (i) adequately compensate Kramig for this acceleration, and (ii) reasonably adjust Kramig's completion date.

51. Gemma's demand that Kramig increase its manpower and accelerate its work on the Project without appropriate compensation or schedule adjustments constitutes a cardinal change to the Kramig Subcontract. This cardinal change was not within the reasonable contemplation of Great American when it wrote the Bond.

52. As a direct consequence of this cardinal change, Great American has suffered prejudice and, as a result, this Court should declare the Bond void *ab initio* and confirm that Great American has no liability to Gemma under the terms of the Bond.

## COUNT II
**Declaratory Judgment: Gemma's Breach of the Bond Relieves Great American of its Performance Obligations under the Terms of the Bond**

53. Great American incorporates by reference, as if fully restated herein, all allegations contained in paragraphs 1 through 52 of the Complaint.

54. Under the terms of the Bond, Great American's obligations to Gemma arise if, and only if, Gemma is not in default under the terms of the contract covered by the Bond and the terms of the Bond itself.

55. Pursuant to Paragraphs 3.2, 4 and 12.1 of the Bond, Great American has no obligation to perform under the terms of the Bond unless and until Gemma has agreed to pay Great American the entire Contract Balance under the terms of the Kramig Subcontract or otherwise commit the Contract Balance to the completion of the Kramig Subcontract scope of work.

56. Despite repeated requests, Gemma has steadfastly refused to pay the Contract Balance to Great American or to otherwise agreed to commit the Contract Balance to the completion work, as the Bond unambiguously requires.

57. This Court should therefore declare that Gemma has committed a material breach of the contract and/or has failed to fulfill a condition precedent to Great American's obligation to perform under the terms of the Bond and, as a consequence, Great American has no duty to perform under the terms of the Bond.

## COUNT III
**Declaratory Judgment: Great American's Obligations under the Terms of the Bond, if any, are Limited to the Penal Sum**

58. Great American incorporates by reference, as if fully restated herein, all allegations contained in paragraphs 1 through 57 of the Complaint.

59. Pursuant to Paragraph 6 of the Bond, Great American's exposure is limited "[t]o the limit of the amount of this Bond"—that is, the Penal Sum. Ignoring this fact, Gemma has made a demand of Great American on its Bond claim that exceeds $6 million.

60. This Court should declare that Great American's obligations under the terms of the Bond, if any, are limited to the Penal Sum.

## COUNT IV
**Declaratory Judgment: A Financial Adjustment to Kramig Subcontract is Warranted**

61. Great American incorporates by reference, as if fully restated herein, all allegations contained in paragraphs 1 through 60 of the Complaint.

62. Gemma's deficient management of the Project resulted in schedule compression that adversely impacted Kramig's ability to perform its work as originally contemplated under the terms of the Kramig Subcontract.

63. This same schedule compression rendered it impossible for any replacement subcontractor to complete Kramig's scope of work under the terms originally contemplated by the Kramig Subcontract.

64. This Court should declare that the Kramig Subcontract price is subject to an upward adjustment in an amount to sufficiently account for all delays and schedule compression that resulted directly from Gemma's deficient Project Management and were beyond the control of Kramig—both before Kramig ceased its work on the Project and after.

## COUNT V
**Declaratory Judgment: Gemma's Breach of the Kramig Subcontract Relieves Great American of its Performance Obligations under the Bond**

65. Great American incorporates by reference, as if fully restated herein, all allegations contained in paragraphs 1 through 64 of the Complaint.

66. Pursuant to Paragraph 3 of the Bond, Gemma has rights under the terms of the Bond if, and only if, it has not defaulted under the terms of the Kramig Subcontract.

67. Prior to submitting its claim against the Bond, Gemma was in material default under the terms of the Kramig Subcontract. Among other things Gemma: (i) failed to issue formal, written line releases as was expressly required such that Kramig could timely complete its insulation work; (ii) failed to properly administer the Project such that the schedule was maintained and precedent work was accomplished on a timely, orderly basis; (iii) failed to timely pay contract funds for work performed; and (iv) accelerated Kramig's work as a direct consequence of its own Project mismanagement yet refused to compensate Kramig for its accelerated work (collectively the "Gemma Events of Default").

68. Each of the Gemma Events of Default were material and preceded any alleged default by Kramig under the terms of the Kramig Subcontract.

69. Given the foregoing, this Court should declare that the Gemma Events of Default preclude any obligation that Great American may have otherwise had under the terms of the Bond with respect to Gemma's Bond claim.

**WHEREFORE,** the Plaintiff, Great American Insurance Company, demands the following relief:

1. Judgment on Count I of its Complaint declaring that the Bond is void *ab initio* and that Great American has no liability thereunder;

2. Judgment on Count II of its Complaint declaring alternatively that Gemma's breach of the Bond relieves Great American of its performance obligations under the terms of the Bond;

3. Judgment on Count III of its Complaint declaring alternatively that Great American's obligations under the terms of the Bond, if any, are limited to the penal sum of the Bond;

4. Judgment on Count IV of its Complaint declaring alternatively that an upward

18

        financial adjustment to the Kramig subcontract is warranted;

5.      Judgment on Count V of its Complaint declaring that Gemma's default(s) under the terms of the Kramig Subcontract relieve Great American of any obligations of any kind with respect to Gemma's Bond claim; and

6.      For any and all other relief, whether at law or in equity, which the Court may deem appropriate.

        *s/ James D. Houston*
        James D. Houston (0072794)
        Ulmer & Berne LLP
        600 Vine Street, Suite 2800
        Cincinnati, Ohio 45202-2409
        (513) 698-5048/(513) 698-5049 (fax)
        jhouston@ulmer.com
        *Counsel for Great American Insurance Company*