# EXHIBIT "1"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY | : | CASE NO. 1:18-cv-00213-TSB |
| | : | (Judge Timothy S. Black) |
| Plaintiff | | (Magistrate Karen L. Litkovitz) |
| | : | |
| vs. | | **[PROPOSED]** |
| | : | **INTERVENING COMPLAINT** |
| GEMMA POWER SYSTEMS, LLC | | |
| | : | **(JURY DEMAND ENDORSED** |
| Defendant | | **HEREON)** |
| | : | |

Plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC (collectively "Kramig"), through its counsel, state for their Intervening Complaint against defendant Gemma Power Systems, LLC ("Gemma") as follows:

## *PARTIES*

1. Kramig Industrial, Inc. ("Kramig Industrial") is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Kramig Industrial is qualified and authorized to transact business in the State of Ohio. Kramig Industrial's principal business was as an insulation installation and scaffolding erection contractor.

2. Kramig, Inc. is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Kramig, Inc. is qualified and authorized to transact business in the State of Ohio. Kramig, Inc.'s principal business was as an insulation installation contractor.

      3.      R.E. Kramig & Co., Inc. is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. R.E. Kramig & Co., Inc. is qualified and authorized to transact business in the State of Ohio.

      4.      Kramig Corp., is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Kramig Corp. is qualified and authorized to transact business in the State of Ohio. Kramig Corp.'s principal business was scaffolding erection contracting.

      5.      Diversified Industrial Capital Group, Inc. is a corporation organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. Diversified Industrial Capital Group, Inc. is qualified and authorized to transact business in the State of Ohio. Diversified Industrial Capital Group, Inc. is the sponsor corporation of the Diversified Industrial Capital Group Employee Stock Ownership Plan which owns Diversified Industrial Capital Group, Inc. Diversified Industrial Capital Group, Inc. is the sole shareholder of Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc. and Kramig Corp.

      6.      South Wayne, LLC is a limited liability company organized under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio. South Wayne, LLC is qualified and authorized to transact business in the State of Ohio. South Wayne, LLC owns the real estate where Kramig, Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., and Diversified Industrial Capital Group, Inc. are located.

      7.      Gemma is a company organized under the laws of the State of Connecticut and is registered as a foreign limited liability company in the State of Ohio.

## *JURISDICTION AND VENUE*

8. This Court has jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states.

9. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because the relevant actions, events and transaction occurred within this judicial district.

## *FACTS COMMON TO ALL CLAIMS*

10. The matter concerns the construction of the NTE Middletown Energy Center ("the Project") which is a natural gas electric generating plant located in Butler County, Ohio.

11. Gemma was the general contractor for the Project. Gemma also self-performed most of the pipe installation on the Project.

12. The Project required that the piping and other installed equipment be insulated and to do this, Gemma, on March 7, 2017, requested firm price proposals for the design, supply and installation of piping and equipment insulation for the Project (the "Insulation Subcontract").

13. On March 10, 2017, Gemma requested that Kramig submit a bid for the Insulation Subcontract. On the same day, Kramig confirmed that it would be submitting a proposal.

14. During the bidding process for the Insulation Subcontract, Gemma issued addendums to its request for proposal to clarify certain aspects of the Insulation Subcontract.

15. In the third addendum to all bidders, Gemma stated that the Insulation Subcontract was to begin May 7, 2017 and finish on October 11, 2017, approximately 22 weeks.

16. On May 11, 2017, Gemma notified Kramig that it was on the "short list" of bidders and it would forward revised bid documents to Kramig.

17. On June 28, 2017, Gemma forwarded a draft of the Insulation Subcontract to Kramig with proposed milestone dates with site mobilization to begin on July 10, 2017 and with all work to be completed on January 1, 2018.

18. On July 5, 2017, Gemma requested that Kramig price the Insulation Subcontract if Gemma accelerated the job to finish on December 1, 2017 as opposed to January 1, 2018.

19. After Kramig informed Gemma that the new schedule for the Insulation Subcontract would increase the bid price by $400,000, Gemma informed Kramig that it would go with the original completion date.

20. On July 10, 2017, Gemma provided Kramig with a "Notice of Intent to Award" the Insulation Subcontract to Kramig. Gemma represented that the Insulation Subcontract would take 28 weeks to complete with mobilization starting on July 10, 2017 and the final completion date being January 22, 2018.

21. On July 11, 2017, Gemma requested a manpower loading schedule consistent with a 28-week schedule and meeting the milestone dates prepared by Gemma. On the same day, Kramig provided Gemma with a manpower loading schedule which showed a schedule of 10-hour days, 5 days a week, for 28 weeks with the peak manpower count of 35. Gemma approved this schedule.

22. As described in the Insulation Subcontract proposals, Gemma proposed a specific schedule as to when portions of the insulation work were to be available for performance. Kramig relied upon and used this proposed schedule prepared by Gemma to determine staffing and manpower utilization and to determine costs including cash flow needs for it to perform the Insulation Subcontract so it could submit a bid for the Insulation Subcontract.

4

23. After Gemma approved the manpower loading schedule and on July 12, 2017, Gemma provided the completed Insulation Subcontract to Kramig who executed it the same day.

24. Gemma executed the Insulation Subcontract on July 13, 2017.

25. Unknown by Kramig at the time and concealed by Gemma, as of June 2017 and during the negotiation of the schedule for the Insulation Subcontract, the Project was late because significant segments of the pipe installation work for which Gemma was responsible were significantly behind schedule. The pipe installation work was so late that Gemma created a recovery plan and submitted it to NTE Energy, the owner of the Project, for the purpose of bringing the Project back on schedule. As part of its recovery plan, Gemma added an additional pipe erection shift with the goal of recovering the pipe erection schedule.

26. Despite knowing that Kramig would be unable to meet the schedule in the Insulation Subcontract because the pipe installation was seriously behind schedule, Gemma deliberately misled Kramig by representing to Kramig a proposed schedule it knew that neither Gemma nor Kramig would be able to meet.

27. Although Kramig's work was to begin in earnest during mid-July, 2017, Gemma did not release the first piping insulation work to Kramig until October 2, 2017, which was almost 12 weeks late from the 28-week schedule. The insulation work was delayed because Gemma failed to meet the recovery schedule and the Project's pipe installation continued to be late.

28. The delays caused Kramig to have serious concerns about the Insulation Subcontract schedule. Kramig was particularly concerned because Gemma was not providing it with contractually required line releases so Kramig could begin the insulation work.

5

29. The Insulation Subcontract work was dependent upon the prior completion of heat tracing. "Heat tracing" is the application of radiant heat to the piping system through the use of tubing that is attached to the outside of the pipe. Large segments of Kramig's work could not be commenced because Gemma did not engage a heat trace contractor until September 17, 2017, which was a full two months behind schedule.

30. Gemma knew when it proposed the 28-week schedule to be completed on January 22, 2018 that the delays in hiring a heat trace contractor would adversely impact Kramig's ability to meet this proposed Insulation Subcontract schedule.

31. Kramig and Gemma discussed the delays in the Project schedule and the impact it was having on the Insulation Subcontract schedule. Gemma eventually acknowledged that Kramig was behind schedule because of Gemma's inability to meet the Project schedule.

32. In early October 2017, Kramig was still awaiting approval from Gemma to order materials for its scope of work. Later in October, as the schedule continued to slip because of Gemma's inability to meet the Project schedule, Gemma terminated Kramig's original contacts with Gemma, that is, Rod Strickland, Gemma's Commercial Manager, and Nathan Yuen, Gemma's Technical Representative.

33. Further falsely representing that the Insulation Subcontract schedule provided by Gemma was viable, Gemma agreed and approved that Kramig was to provide a single shift on the Project that would work five ten-hour days per week, Monday through Friday. The delays caused by Gemma prevented Kramig from meeting the schedule.

34. In October 2017 and in response to Gemma's request that Kramig submit an increased manpower schedule, Kramig submitted a budget of $925,000 to increase its crew to 70 men working on a 7:00 a.m. to 10:00 p.m. schedule for a period of 6 to 7 weeks. Kramig's

6

proposed budget was contingent upon Gemma providing Kramig with timely line releases and other trades completing their work. In response to this proposed budget, Gemma offered to pay Kramig only $243,000 for premium hours necessary because of Gemma's delays. Likewise, Gemma increased the number of liquidated damages in the Insulation Subcontract from 1 to 19, and thereby exhibiting bad faith in the negotiations.

35. Although Kramig and Gemma could not agree on the amount Gemma owed Kramig for the compression of the schedule and the increase in premium pay, Kramig, in good faith, proceeded to accelerate its work on the compressed schedule.

36. On November 25, 2017, Gemma formally demanded that Kramig accelerate its work under the compressed schedule Gemma proposed. Kramig continued to negotiate with Gemma through the remainder of November and into December 2017 for a change order that would compensate Kramig for Gemma's demand for an accelerated schedule.

37. Kramig submitted applications for payment to Gemma for the work performed to date under the Insulation Subcontract; however, Gemma did not pay the sums owed. Moreover, during negotiations of the change order to compensate Kramig for Gemma's demand for accelerated work, Kramig requested that Gemma allow for accelerated payment of applications for payment. Gemma refused Kramig's request and Kramig is owed $1,088,029.26 for work it performed.

38. Because Gemma refused to compensate Kramig for work it had already completed, for the accelerated work it had already performed or for the anticipated future accelerated work, Kramig was almost out of operating capital and was forced to leave the Project on December 19, 2017. Gemma then terminated the Insulation Subcontract and Kramig from the Project.

7

39. In November of 2017, Kramig entered into a letter of intent to sell its assets for approximately $4,100,000 which was subsequently withdrawn in January of 2018 because of the financial harm caused by Gemma's actions toward Kramig.

40. At the end of January 2018, Diversified Industrial Capital Group, Inc. lost all value which, in turn, caused the ESOP participants' accounts to fall to zero value. This total loss in value of the participants' accounts triggered a Department of Labor inquiry.

41. Beginning in February, 2018, Kramig closed its doors and began liquidating its assets.

## COUNT I
### (Fraud in the Inducement)

42. Kramig repeats the foregoing allegations as if fully restated herein.

43. Gemma represented to Kramig during the negotiation of the Insulation Subcontract that it would be completed in 28-week period.

44. Gemma further represented to Kramig during the negotiations of the Insulation Subcontract that the manpower loading schedule for the Insulation Subcontract would be 10-hour days, 5 days a week, Monday through Friday.

45. Gemma knew that these representations were false when they were made because the Project was already late because significant segments of the pipe installation work were significantly behind schedule.

46. Gemma knew that these representations were false because Gemma was subject to a recovery plan for the purpose of bringing the pipe erection portion of the Project back on schedule.

47. The misrepresentations by Gemma were material facts.

8

48.     Kramig justifiably relied upon Gemma's misrepresentations regarding the schedule for the Insulation Subcontract and entered into the Insulation Subcontract with Gemma.

49.     The misrepresentations by Gemma were made with knowledge of their falsity or utter disregard and recklessness as to falsity with the intent to mislead Kramig into entering into the Insulation Subcontract. Kramig would not have entered into the Insulation Subcontract with Gemma but for Kramig's justifiable reliance on the fraudulent misrepresentations of Gemma.

50.     Kramig has sustained damages and Gemma should not be permitted to rely upon and enforce the Insulation Subcontract that was obtained by fraudulent inducement.

## COUNT II
### (Fraud)

51.     Kramig repeats the foregoing allegations as if fully restated herein.

52.     Gemma made material misrepresentations of fact to Kramig during the negotiations of the Insulation Subcontract. The misrepresentations include, but are not limited to, that the work would be completed in a 28-week period and that the manpower loading schedule for the Insulation Subcontract would be 10-hour days, 5 days a week, Monday through Friday.

53.     Gemma made these representations to Kramig in the expectation that Kramig would rely upon them and enter into the Insulation Subcontract.

54.     After fraudulently inducing Kramig to enter into the Insulation Subcontract, Gemma continued to make material misrepresentations to Kramig regarding the progress of the Project and payment to Kramig for accelerating the work.

55.     Gemma made these misrepresentations to Kramig in expectation that Kramig would rely upon them and continue to perform work under the Insulation Subcontract. These continual misrepresentations were part of a scheme by Gemma to shift the financial consequence of its delay upon Kramig.

56. Kramig justifiably relied to its detriment upon the representations of Gemma.

57. Kramig has sustained damages as a result of Gemma's fraud.

## COUNT III
### (Negligent Misrepresentation)

58. Kramig repeats the foregoing allegations as if fully restated herein.

59. Gemma, in the course of its business, supplied false information for the guidance of Kramig in its bidding on the Insulation Subcontract, and Kramig is the entity for whose benefit and guidance Gemma intended to supply the information.

60. Gemma failed to exercise reasonable care or competence in obtaining or communicating the information.

61. Kramig justifiably relied on the information causing Kramig to suffer loss.

62. Kramig has sustained damages as a result of Gemma's negligent misrepresentations.

## COUNT IV
### (Unjust Enrichment)

63. Kramig repeats the foregoing allegations as if fully restated herein.

64. Gemma voluntarily accepted and retained the benefit of Kramig's work it performed on the Project.

65. Gemma has not paid Kramig for the work it performed on the Project, the value of which totaled $1,088,029.26.

66. Gemma has been unjustly enriched through its failure to pay Kramig for the work it performed on the Project.

67. It would be inequitable for Gemma to retain the benefit of the work Kramig performed on the Project without paying Kramig for the value of the work.

68. Pursuant to the equitable doctrine of unjust enrichment, Kramig is entitled to recover the value of the work it performed on the Project.

**WHEREFORE**, plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC request that the Court enter judgment in their favor and award them relief including, but not limited to, the following:

A. An Order holding that defendant Gemma Power Systems, LLC's actions described above make it liable for the damages to plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC;

B. An Order awarding damages in an amount proven at trial to plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC from defendant Gemma Power Systems, LLC;

C. An Order requiring defendant Gemma Power Systems, LLC to pay plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC's attorney's fees in this matter;

D. An Order awarding plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC punitive damages in an amount proven at trial; and,

E. Any other relief that the Court may deem appropriate.

        /s/ *C.J. Schmidt*
C.J. Schmidt (0034030)
Jeffrey R. Teeters (0061801)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202
(513) 852-6000
(513) 419-6452 (Fax)
cjschmidt@woodlamping.com
jrteeters@woodlamping.com

Trial Attorneys for Plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC

### *JURY DEMAND*

Plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC demand a jury trial on all of its claims so triable.

        /s/ *C.J. Schmidt*
C.J. Schmidt (0034030)
Jeffrey R. Teeters (0061801)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202
(513) 852-6052
(513) 419-6452 (Fax)
cjschmidt@woodlamping.com
jrteeters@woodlamping.com

Trial Attorneys for Plaintiffs Kramig Industrial, Inc., Kramig, Inc., R.E. Kramig & Co., Inc., Kramig Corp., Diversified Industrial Capital Group, Inc. and South Wayne, LLC

**CERTIFICATE OF SERVICE**

      I hereby certify that on the _____ day of _____, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| James D. Houston<br>Ulmer & Berne LLP<br>600 Vine Street, Suite 2800<br>Cincinnati, Ohio 45202<br>jhouston@ulmer.com | Gregory D. Brunton<br>Gordon Rees Scully Mansukhani, LLP<br>41 South High Street, Suite 2495<br>Columbus, Ohio 43215<br>gbrnton@grsm.com |
| and | Counsel for Defendant Gemma Power Systems, LLC |
| David Conrad Olson<br>Frost Brown & Todd<br>301 East Fourth Street<br>3300 Great American Tower<br>Cincinnati, Ohio 45202<br>dolson@fbtlaw.com | |
| Counsel for Great American Insurance Company | |

                                                /s/ C.J. Schmidt

**2623351.2**